# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39125**

————————————

**UNITED STATES**
*Appellee*

**v.**

**John D. GONZALEZ**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 22 March 2018

————————————

*Military Judge:* Marvin W. Tubbs II.

*Approved sentence:* Bad-conduct discharge, confinement for 6 years, and reduction to E-1. Sentence adjudged 21 April 2016 by GCM convened at Scott Air Force Base, Illinois.

*For Appellant:* Major Mark C. Bruegger, USAF; Captain Patrick A. Clary, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Mary Ellen Payne, USAF; Major J. Ronald Steelman III, USAF; Gerald R. Bruce, Esquire.

Before JOHNSON, MINK, and DENNIS, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Judge MINK and Judge DENNIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault

by causing bodily harm in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. The court-martial sentenced Appellant to a bad-conduct discharge, confinement for six years, total forfeiture of pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the adjudged forfeitures, approved the remainder of the sentence, and waived mandatory forfeitures for the benefit of Appellant's dependent child.

Appellant raises nine issues for our consideration on appeal: (1) Whether the military judge erred by admitting "consciousness of guilt" statements by Appellant pursuant to Military Rule of Evidence (Mil. R. Evid.) 404(b); (2) Whether the military judge erred by admitting Appellant's recorded statement to a civilian police detective who failed to administer a rights advisement; (3) Whether Appellant's conviction is factually sufficient; (4) Whether trial defense counsel provided ineffective assistance of counsel (IAC) during the trial; (5) Whether Appellant is entitled to sentence relief due to the Government's failure to provide him adequate medical care during his post-trial confinement; (6) Whether the military judge erred by permitting a Government witness to testify as an expert in "medical legal examinations"; (7) Whether the Government violated its discovery obligations by failing to disclose defects in the chain of custody of certain evidence; (8) Whether the military judge erred by accepting trial counsel's race-neutral explanation for exercising a peremptory challenge against a member of the court-martial panel; and (9) Whether the military judge erred by failing to appropriately address a question from one of the panel members during deliberations on findings.[1] In addition, we address a separate question of IAC during the post-trial process not initially raised by Appellant, and a facially unreasonable delay in the appellate review of Appellant's case. We find no error with respect to the issues initially raised by Appellant[2] and no relief warranted for the delay in appel-

---

[1] Appellant personally raises issues (2) through (9) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[2] We have carefully considered all of the issues raised by Appellant, but not all of them require discussion in the opinion. With respect to issue (6), the witness in question was highly experienced in conducting "medical legal examinations" and the military judge did not abuse his discretion in recognizing her as an expert with regard to performing such exams. With respect to issue (7), the Defense did not object or request relief at trial and we find no plain error by the military judge. With respect to issue (8), trial counsel clearly explained the race-neutral basis for the peremptory challenge—an arguably misogynistic Facebook post by the court member in question—and the military judge did not abuse his discretion by accepting that explanation. With respect to issue (9), counsel for both parties agreed to the military judge's

*(Footnote continues on next page)*

late review; however, we find that IAC unaddressed by the staff judge advocate (SJA) during the post-trial process requires a new post-trial process and action by the convening authority.

## I. BACKGROUND

Appellant was a tactical air controller stationed at Fort Campbell, Kentucky, but who lived in Nashville, Tennessee, with his wife and young son. Appellant and his family were good friends with EW, a female civilian who lived next door with her boyfriend at the time, ME, and another male housemate, JS. The two households developed a close relationship after Appellant's family moved into their house in 2012. They would frequently socialize, and EW had a key to Appellant's house because she would often babysit Appellant's son as well as pick him up from daycare.

In early April 2013, EW's then-boyfriend ME was out of town for work-related travel. Appellant's wife and son were also on a trip outside the state. Before she left, Appellant's wife asked EW to "watch over" Appellant while she was gone to "make sure that he'd be okay." Appellant had suffered a non-combat back injury during a deployment to Afghanistan from which he returned earlier in 2013, although the effects of the injury had not yet fully appeared.

EW returned home from work on the evening of 4 April 2013. Although she felt "exhausted" and "drained," she invited Appellant to go out and "have a drink." Appellant accepted on the condition that EW drive because Appellant had already been drinking alcohol. EW also invited a female friend, but that friend did not join them. EW and Appellant visited two bars. EW drank two mixed drinks at the first; at the second, Appellant ordered a beer for EW but she did not drink it. They talked about EW's frustrations with her work and issues in Appellant's marriage. The second bar had live music and EW and Appellant danced "side-by-side" facing the band.

EW drove Appellant back to his house. Appellant said he wanted to continue drinking and went into his house to get beer. EW went into her house and changed out of her work uniform and into pajama pants and a t-shirt. Appellant came to EW's house and they continued talking in EW's kitchen. Appellant continued to drink beer; EW had "a few sips." There was no kissing

decision to re-read a portion of the instructions to answer the question, and the president of the court affirmed that this answered the member's question. We find these issues do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

or other flirtatious behavior. EW felt cold, so she moved to sit over an air vent on the floor of the kitchen. In that position, she fell asleep.

EW awoke in her bed. Her pajama pants were pulled "just below [her] bottom." Appellant was anally penetrating her. EW felt "confused" and "terrified" and was "afraid of being hurt." She later testified, "I laid there for a minute and then I said, '[ME], not right now,' because I thought it was [ME] in my bed. And then shortly after that it stopped. I heard a belt buckle and there was movement. Then he got out of my bed." Appellant departed the room and the house without saying anything.

EW waited "a little bit" before sending Appellant a text message to let him know that she knew he was in her house. The message read, "How long was I asleep? I woke up from what I thought was a dream.. [sic] I saw [ME] nd [sic] all and he's not here and you were..[sic]" Appellant did not respond right away, but later in the morning he replied, "I putt [sic] you in your bed and left you were drunk, I did not lock the door since I do not have a key so that's my bad[.]"

After she sent the text message, EW called ME. ME later testified EW was "hysterical" and told him she had been raped. ME called their housemate, JS, who was also not home at the time. JS in turn called the police. The police and JS arrived at EW's house at approximately the same time. The police disarmed EW, who had armed herself with a handgun because she was afraid Appellant would return. JS's girlfriend, MM, also arrived at the house and described seeing EW on the kitchen floor "sobbing uncontrollably" and apparently "traumatized." MM heard EW say, *inter alia*, that she was afraid Appellant would "come back and hurt [EW] if he knew [EW] called the police."

Eventually the police transported EW to a hospital where she consented to a medical exam of her "rectal area." No vaginal exam was performed because EW "was on [her] period and had a tampon in," as she had throughout the night. The exam and subsequent forensic analysis revealed the presence of Appellant's semen on swabs taken from the area of EW's anus.

Appellant was interviewed by Sergeant (Sgt) JF of the Nashville Police Department that morning. The interview took place in Sgt JF's vehicle near Appellant's house. Sgt JF recorded the interview on a cell phone. At the outset, Sgt JF informed Appellant that Appellant was not under arrest, did not have to talk to Sgt JF, and was free to leave. Sgt JF did not advise Appellant of his *Miranda*[3] rights. During the interview, Appellant described going out

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

for drinks with EW the previous evening, returning, and continuing to talk and drink in EW's kitchen. He claimed that after EW fell asleep he was unable to wake her, so he carried her upstairs and put her in her bed. Appellant stated he then departed, leaving the front door unlocked because he did not have a key. Appellant denied any sexual activity occurred. Appellant also initially denied there had been any flirtatious behavior; he later claimed EW had been flirtatious, although he did not provide any specific examples when Sgt JF prompted him. Toward the end of the interview, Sgt JF informed Appellant that EW had told the police Appellant "had sex" with her after she passed out.

Shortly thereafter, Appellant sent a text message to his supervisor, Technical Sergeant (TSgt) TR, to report that Appellant would be arriving late for duty that day. Appellant claimed the reason for his tardiness was that the police had interviewed him about vandalism in his neighborhood. After Appellant arrived for duty, Appellant told another supervisor, TSgt JM, "some stuff had been vandalized in his neighborhood" and his neighbor was "freaking out." He did not mention any allegation of sexual misconduct.

Before trial, the Government provided notice to the Defense pursuant to Mil. R. Evid. 404(b) of its intent to introduce at trial Appellant's statement to TSgt TR "to show consciousness of guilt, motive, and intent to deceive." The Defense moved to exclude the evidence. The Defense contended that, in light of the circumstances, the statement was not evidence of consciousness of guilt or motive, and that any purported intent to deceive was not relevant to the sole charged offense of sexual assault. The Defense further argued that, even if the evidence were relevant for such a purpose, any legitimate probative value did not substantially outweigh the danger of unfair prejudice. *See United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). The Government countered that these false statements were relevant circumstantial evidence of Appellant's consciousness of guilt of the charged offense because they were intended to conceal Appellant's crime from the military, and the probative value was not outweighed by the danger of unfair prejudice.

The military judge denied the Defense motion in an oral ruling. Applying the three-part test articulated in *Reynolds*, *id.*, the military judge determined the court members could find Appellant made an inaccurate statement to conceal from his chain of command the reason for his being late to work, which was relevant to show a consciousness of guilt. The military judge further found the danger of unfair prejudice was "quite low" and did not substantially outweigh the probative value. Appellant's statements to his supervisors were subsequently admitted at trial in the form of a stipulation of expected testimony of TSgt TR and witness testimony from TSgt JM. Prior to deliberations on findings, the military judge instructed the court members

they could consider this evidence "for the limited purpose of its tendency, if any, to show [Appellant's] awareness of his guilt of the offense charged," but not for any other purpose, and they "may not conclude from this evidence that [Appellant] is a bad person or has general criminal tendencies and that he therefore committed the offense charged."

## II. DISCUSSION

### A. Mil. R. Evid. 404(b) Evidence

#### 1. Law

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including *inter alia* proving motive, intent, or consciousness of guilt. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010).

We review a military judge's decision to admit evidence for an abuse of discretion. *Staton*, 69 M.J. at 230. The United States Court of Appeals for the Armed Forces (CAAF) has established a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that [the] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Id.* (quoting *Reynolds*, 29 M.J. at 109). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts was clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). In reviewing the military judge's decision to admit evidence, we consider the evidence in the light most favorable to the prevailing party. *United States v. Rodriguez*, 60 M.J. 239, 246−47 (C.A.A.F. 2004).

#### 2. Analysis

Appellant contends the proffered Mil. R. Evid. 404(b) evidence that he misled his supervisors regarding his reason for being late for duty on 5 April 2013 fails the second prong of the *Reynolds* test. Specifically, he asserts these statements had "no bearing on his exposure to the charged offense" but rather were motivated by a desire to "mitigate his failure to report to duty on time." Appellant contrasts these statements with his statements to Sgt JF that he had no sexual contact with EW, which he concedes were logically relevant false exculpatory statements that did evidence a consciousness of guilt. Appellant further contends the military judge abused his discretion by finding these statements did not unfairly prejudice Appellant when, he asserts, evidence that he lied to his supervisors had the "potential to generate conclusions about [Appellant's] character, veracity, or criminal disposition generally." We are not persuaded.

Applying the first prong of the *Reynolds* test, we find the evidence did reasonably support a finding Appellant committed a prior crime, wrong, or act, specifically that he intentionally misled his supervisors about the reason he was late for duty on 5 April 2013. The stipulation of expected testimony of TSgt TR and testimony of TSgt JM both supported such a finding. The Defense neither elicited nor offered any evidence to contradict this stipulation and testimony.

As to the second prong, despite Appellant's argument to the contrary, this evidence did make a fact of consequence to the court-martial more probable. Relevance is a "low threshold." *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010). Evidence is relevant if it has *any* tendency to make the existence of a fact more probable or less probable than it would be without the evidence. Mil. R. Evid. 401(a). Pretrial conduct, including misleading or false statements, may give rise to negative inferences. *United States v. Stadler*, 47 M.J. 206, 211 (C.A.A.F. 1997). In particular, "[a]dmitting evidence tending to show the accused's consciousness of guilt is an accepted principle of military jurisprudence." *United States v. Borland*, 12 M.J. 855, 857 (A.F.C.M.R. 1981) (citing *United States v. Hurt*, 27 C.M.R. 3 (C.M.A. 1958)). The CAAF has recognized that evidence of consciousness of guilt may properly be admitted pursuant to Mil. R. Evid. 404(b). *Staton*, 69 M.J. at 230. Viewing the facts of this case in the light most favorable to the Government, the court members could infer from these false statements that Appellant wanted to hide the sexual assault allegation from the Air Force because he feared prosecution based on a credible allegation of sexual assault.[4] By the end of his interview by Sgt JF,

---

[4] The irony of Appellant's claim that these false statements to his military superiors had "no bearing on his exposure to the charged offense"—because the civilian police

*(Footnote continues on next page)*

Appellant was aware not only of the events of the previous night but also that EW had told the police that Appellant "had sex" with her after she passed out. If, as the Defense suggests, Appellant merely sought to explain his failure to report on time, he could have told his supervisors that he was interviewed by the police without inventing the fictional vandalism. His efforts to deceive his supervisors can reasonably be inferred to reflect a consciousness of guilt.

Finally, we are not persuaded that the probative value of these statements was substantially outweighed by the danger of unfair prejudice. Appellant lied to two different supervisors about the reason he was interviewed by civilian police, evidently in an effort to prevent the Air Force from learning about a sexual assault allegation against him. Coupled with his false statements to Sgt JF that same morning, these lies were substantial evidence of a consciousness of guilt. On the other hand, the danger of *unfair* prejudice from this evidence was relatively low. Appellant was not charged with making a false official statement or similar offense, removing the prospect that evidence of these statements would be misused as character evidence similar to a charged offense. In addition, the military judge provided the members an appropriate limiting instruction on the proper use of this evidence. Therefore, the risk that the court members would misuse this information was relatively low.

Accordingly, we conclude the military judge did not abuse his discretion in admitting this evidence, and Appellant is entitled to no relief on this basis.

**B. Appellant's Statements to Sgt JF**

**1. Additional Background**

At trial, the Government moved to pre-admit Appellant's recorded interview by Sgt JF as Prosecution Exhibit 1. The Defense objected specifically on the grounds that its probative value was outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. Appellant's civilian defense counsel, JP, argued that the probative value was low because, given the context that Sgt JF had not yet informed Appellant he was accused of any crime, his denial of sexual contact was not indicative of a consciousness of guilt. The unfair prejudice, the Defense contended, was that Appellant's false statements during the interview portrayed him as a liar when his credibility was not yet in issue because he had not testified before the court members. When the military

---

were aware of the allegation—is that the Air Force prosecuted him for sexually assaulting EW after the civilian authorities elected not to prosecute the case.

judge inquired whether the Defense objected based on Sgt JF's failure to advise Appellant of his rights, JP responded "No, sir. It's not that he should have been read his rights; that's not what I'm purporting at all, sir."

The military judge overruled the objection, finding that Appellant's explanation regarding his activities on the night in question was relevant, and the possibility that contradictory evidence might be introduced did not create a danger of *unfair* prejudice. The military judge then asked if there were any other objections to Prosecution Exhibit 1. Appellant's counsel stated there were not. The military judge admitted the exhibit, which was subsequently played in court for the members.

### 2. Law

In general, we review a military judge's decision to exclude or admit evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). This means the military judge's findings of fact are reviewed for clear error but his conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted).

Whether an appellant has waived an issue is a question of law we review de novo. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (internal quotation marks and citations omitted). When an appellant has "intentionally waive[d] a known right at trial, it is extinguished and may not be raised on appeal." *Id.* Forfeited objections to evidence are reviewed for plain error, which exists where: (1) an error was committed; (2) the error was plain, clear, or obvious; and (3) the error resulted in material prejudice to substantial rights. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (citing *United States v. Powell*, 49 M.J. 460, 463–65 (C.A.A.F. 1998)).

### 3. Analysis

Appellant now contends the military judge erred by admitting Appellant's recorded interview because Sgt JF did not administer a rights advisement and Appellant did not feel free to leave, despite Sgt JF informing him that he was not under arrest and was free to go. In addition, Appellant asserts that during the interview he was still too intoxicated from drinking alcohol the night before to give valid consent to the interview. As a result, Appellant asserts the findings and sentence should be set aside. We are not persuaded.

At trial, Appellant's counsel explicitly disavowed any objection to Prosecution Exhibit 1 based on Sgt JF's failure to advise Appellant of his rights. In context, it is apparent the trial defense counsel did not believe Appellant's interview by Sgt JF was a custodial interrogation, and therefore the requirement for a rights advisement was not triggered. *See Miranda*, 384 U.S. at 467–71. We find Appellant waived this issue at trial. Recognizing our authority to decline to apply waiver and take corrective action when warranted, we find no such exercise of our authority under Article 66(c),UCMJ, 10 U.S.C. § 866(c), is appropriate in this case. *See United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

As to whether Appellant was too intoxicated to give a voluntary statement, assuming *arguendo* that the Defense merely forfeited, rather than waived, this issue, we find no plain error by the military judge. Involuntary statements are generally inadmissible, *see Freeman*, 65 M.J. at 453, but there is little evidence of involuntariness here. Appellant's answers to Sgt JF's questions during the interview were generally clear and responsive. Appellant's voice on the recording is not slurred or otherwise suggestive of someone significantly impaired by alcohol. On cross-examination, Sgt JF testified he could not recall for certain whether he smelled alcohol on Appellant, but he believed he did not. Furthermore, the questioning itself was neither overbearing nor particularly manipulative. Accordingly, we find the military judge did not commit plain error by failing to exclude sua sponte Appellant's interview by Sgt JF as involuntary due to intoxication.

## C. Factual Sufficiency of the Evidence

### 1. Law

We review issues of factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.R. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

### 2. Analysis

As the military judge instructed the court members, the elements of the offense charged in this case included:

> (1) That on or about 5 April 2013 at or near Nashville, Tennessee, [Appellant] committed a sexual act upon [EW], to wit: penetration of [EW's] anus with his penis;
>
> (2) That [Appellant] did so by causing bodily harm to [EW], to wit: penetrating [EW's] anus with his penis; and
>
> (3) That [Appellant] did so without the consent of [EW].

*See* Article 120(b)(1)(B), UCMJ, 10 U.S.C. § 920(b)(1)(B).

Appellant contends EW's testimony regarding the sexual assault itself was unreliable for two reasons. First, EW testified that when she awoke she initially thought her then-boyfriend ME was in her bed, rather than Appellant. Second, although EW testified she was anally penetrated "[a]t least two or three times," she acknowledged on cross-examination that when she was interviewed by the Defense the day before trial, she did not say it occurred two or three times. In addition, Appellant argues the DNA evidence does not confirm anal penetration occurred because the internal anal swab and the swab from the external "rectal area" were packaged and tested together.

Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. EW testified Appellant anally penetrated her without her consent while she was asleep in her bed. Appellant's DNA was found on swabs from EW's rectal area. EW's initial confusion upon being awoken by Appellant's sexual assault is understandable, but her allegation that Appellant anally penetrated her was consistent, immediately reported, and powerfully corroborated by the DNA evidence. Appellant's statements to Sgt JF generally corroborate EW's testimony up to the point that she unexpectedly fell asleep in her kitchen. He further confirmed that he knew she was asleep and did not consent because he carried her upstairs and she did not awaken. The DNA evidence belies Appellant's claims to Sgt JF that no sexual activity occurred at all. We find Appellant's conviction factually sufficient.

### D. Ineffective Assistance of Counsel at Trial

### 1. Law

The Sixth Amendment guarantees Appellant the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel we apply the standard set forth in

*Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). We review allegations of IAC de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are [A]ppellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

**2. Analysis**

Appellant contends his trial defense counsel, JP and Captain (Capt) AH, were constitutionally ineffective in two respects. First, he argues trial defense counsel failed to use over 100 pages of information gathered from EW's social media accounts to rebut factual assertions in EW's unsworn statement to the court members about the impact of Appellant's crime. Second, he argues trial defense counsel failed to call four potential sentencing witnesses who would have been "beneficial" to his case. Appellant submitted a declaration to this court in support of these contentions, which essentially indicates that he wanted this rebuttal evidence used and these witnesses called, and he did not know why they were not.

In response to these allegations, we ordered and received declarations from JP and Capt AH. JP's declaration in particular contradicts Appellant's declaration in that JP asserts Appellant was informed and understood why this evidence and these witnesses were not used. Because we are presented with conflicting declarations, we have considered whether a post-trial evidentiary hearing is required. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). In this case, we are convinced such a hearing is unnecessary. The contradic-

tions do not involve the substantive decisions the counsel made or the reasons for those decisions, but only Appellant's purported awareness of those reasons. Even if we accepted Appellant's assertion that he was not aware of the reasons, the alleged errors would not result in relief. *See Ginn*, 47 M.J. at 248.

Turning to the substance of Appellant's claims, we find JP and Capt AH provide a reasonable explanation why they did not attempt to rebut EW's unsworn victim impact statement with her social media information. The material did not particularly rebut EW's unsworn statement, and Appellant provides no examples of specific contradictions. Even if it were admissible as rebuttal evidence, the material, including "ordinary pictures of someone going on with their life" as JP put it, was unremarkable and unlikely to impress the court in Appellant's favor. In addition, JP and Capt AH reasonably feared using such material to challenge whether EW suffered negative emotional impact from the sexual assault—of which the court members had just convicted Appellant—risked depicting Appellant as unrepentant and vindictive.

Similarly, trial defense counsel's decisions not to call the four potential sentencing witnesses were also reasonable. Two of the potential witnesses, Staff Sergeant JW and TSgt SO, were a former co-worker and a former supervisor of Appellant. JP explained that after he initially made contact with each, they failed to respond to his repeated subsequent efforts to contact them again. As to their potential testimony, Appellant relates only that they "knew [him] well and had first-hand knowledge about [his] character, work ethic, and personal life." He does not cite any specific or unique information they might have provided that would have substantially enhanced the Defense's sentencing case.

JP and Capt AH considered having the third potential witness, the defense expert psychologist, testify in sentencing, and they had the expert conduct certain testing on Appellant related to recidivism risk to prepare for that possibility. However, after the defense expert was interviewed by trial counsel and the Government's expert in forensic psychology, the defense expert advised JP and Capt AH that his testimony might be more harmful than beneficial in light of the anticipated cross-examination. Specifically, the defense expert's potentially favorable testimony regarding Appellant's risk of recidivism was based on Appellant's revised version of what occurred on the night in question, which was that he and EW engaged in consensual sex. That version of events was discredited, to put it mildly, by the evidence presented and the findings of the court. Not only would cross-examination have gravely undermined the basis for the defense expert's opinion, but it would have given the Government another opportunity to highlight Appellant's lies

and portray him as unrepentant. In this light, we find the decision not to put the defense expert on the stand more than reasonable.

Finally, Appellant complains JP and Capt AH did not have the fourth potential witness, Appellant's treating mental health provider, testify in sentencing about his medical problems. JP and Capt AH agreed that calling the provider as a witness risked exposing detrimental information in Appellant's mental health profile, to include the results of his sanity board. Having Appellant's provider testify risked opening the door to this information, which could have damaged the Defense sentencing case. Appellant was able to provide a general overview of his then-existing medical problems to the court members in his unsworn statement, without the provider's testimony. Under these circumstances, we find JP and Capt AH's decision not to call the provider was reasonable and did not fall measurably below the performance expected of fallible lawyers. *See Gooch*, 69 M.J. at 362. Assuming *arguendo* that it was deficient, Appellant has not shown what specifically the provider would have testified to or how it would have added to the unrebutted information in his unsworn statement. Accordingly, even if JP and Capt AH had been deficient, we cannot discern a reasonable probability the outcome of the court-martial would have been more favorable to Appellant absent the error. *Id.*

### E. Post-Trial Medical Care

#### 1. Additional Background

Prior to Appellant's court-martial, he had received extensive medical treatment for the deployment injury to his back and a variety of other service-related medical problems. On 22 April 2016, the day following his trial, Appellant was examined at Fort Campbell and found medically fit for confinement. He arrived at Naval Consolidated Brig Miramar (NCBM) on 12 May 2016 to continue his sentence to confinement.

A letter dated 7 June 2016, signed by Appellant's stepfather, HL, and mother, JL, and addressed to the NCBM commanding officer, described Appellant's medical problems and treatment history in some detail.[5] The letter complained that his treatments had not been continued following his arrival

---

[5] The letter described the treatment Appellant had been receiving prior to his court-martial as follows: "physical therapy 3–4 times a week, psychiatry 1–2 times a month, psychology 1–2 times a week, aqua therapy 3–5 times a week, yoga 2–3 times a week, constant cranial electrotherapy stimulation (device), stimulation-ultrasound for his back 3–5 times a week, acupuncture, heat therapy, cold therapy, music-waves relaxation, stretching table, Lidocaine Patch 5% daily and [nerve blockers]."

at NCBM, and expressed concern Appellant's condition was "deteriorating drastically." Appellant's parents specifically complained about a particular incident on 25 May 2016 when they alleged Appellant was denied adequate medical care and ended up being taken to an emergency room. Appellant's parents requested an investigation of this incident, and more generally that Appellant receive "proper and rapid medical, mental and physical treatment." This letter was included in the clemency materials Appellant submitted to the convening authority pursuant to Rule for Courts-Martial (R.C.M.) 1105. Appellant's declaration to this court dated 21 August 2017 contains a very general statement that he has not received the medical care that he has requested, but also asserts his parents' 7 June 2016 letter "accurately captures what [he has] been experiencing in terms of medical care."

In response to Appellant's declaration, the Government submitted a declaration from the NCBM commanding officer dated 2 November 2017. The declaration generally describes the medical care available to prisoners. With respect to Appellant, it notes that since his arrival at NCBM, Appellant had "attended 72 medical appointments, to include specialty care at Naval Medical Center San Diego and physical therapy," and received medication as "determined as part of his medical treatment plan and monitored by a licensed physician and psychiatrist." The declaration addresses the 25 May 2016 incident, describing how Appellant apparently suffered a significant medical episode that exceeded the NCBM medical clinic's capabilities and did result in his transportation to the Naval Medical Center San Diego emergency room. The declaration addresses the medical reasons why Appellant's regular medications were changed upon his arrival at NCBM, and asserts he "has not requested any additional evaluations or additional medications for pain management" beyond those he currently receives. Finally, the declaration summarizes the types of specialty medical care he had received since the 25 May 2016 incident, including treatment for traumatic brain injury, physical therapy, speech therapy, neurology, spine adjustment, post-traumatic stress disorder, and the provision of an electrical nerve stimulation device kept by Appellant for his use as needed.

### 2. Law

"Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55 . . . is apparent." *United States v. Gay*, 74 M.J. 736, 740 (A.F. Ct. Crim. App. 2015) *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). To demonstrate a violation of the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that [he] has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938.

*United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006). Pursuant to our broad authority and mandate under Article 66(c), UCMJ, to approve only so much of the sentence as we find appropriate in law and fact, we may grant sentence relief due to an appellant's post-trial treatment even in the absence of an Eighth Amendment or Article 55, UCMJ, violation. *Gay*, 74 M.J. at 742–43; *see United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002).

### 3. Analysis

Appellant has failed to demonstrate he suffered cruel or unusual punishment in violation of the Eighth Amendment or Article 55, UCMJ. We acknowledge that the provision of adequate medical care is a necessity. In addition, we do not question that Appellant has significant, chronic medical problems, or that on 25 May 2016 he suffered acute medical distress that was dangerous, painful, and frightening. However, it does not appear that event was triggered by any dereliction on the part of confinement authorities, and it is apparent those authorities treated the event as a medical emergency and secured emergency care for Appellant. It is also apparent NCBM authorities have gone to significant lengths to secure appropriate care for Appellant's chronic health problems. Although Appellant complains that he has not received the same amount of care he was receiving prior to his confinement, and that he "feel[s] like" he is "going backwards in terms of treatment," Appellant has provided no medical evidence that his health has declined since 25 May 2016.

On the record before us, we find Appellant has failed to demonstrate either "an objectively, sufficiently serious act or omission resulting in the denial of necessities" or "a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety." *Lovett*, 63 M.J. at 215. In addition, we have considered whether the conditions of Appellant's confinement warrant sentence relief under our Article 66(c), UCMJ, authority even in the absence of cruel or unusual punishment. *See Gay*, 74 M.J. at 742–43. We find they do not.

### F. Post-Trial Ineffective Assistance of Counsel

#### 1. Additional Background

On 3 May 2016, Capt AH submitted a request that the convening authority defer Appellant's forfeitures of pay and allowances and reduction in grade

until action, and waive mandatory forfeitures for six months for the benefit of Appellant's dependent son, pursuant to Articles 57(a)(2) and 58b(b), UCMJ, 10 U.S.C. §§ 857(a)(2), 858b(b). On 9 May 2016, in accordance with the advice of the SJA, the convening authority deferred forfeitures until action, postponed a decision on waiver of mandatory forfeitures until action, and declined to defer Appellant's reduction in grade.

On 27 June 2016, the SJA prepared a written recommendation (SJAR) advising the convening authority to approve the court-martial findings and the bad-conduct discharge, confinement for six years, and reduction to E-1, and to waive mandatory forfeitures for six months for the benefit of Appellant's son. This recommendation was served on Appellant and trial defense counsel.

On 3 August 2016, Appellant's civilian trial defense counsel, JP, delivered a voluminous clemency submission to the convening authority on behalf of Appellant pursuant to R.C.M. 1105 and requested that the "charges be dismissed" or in the alternative that Appellant be administratively discharged in place of the court-martial conviction and sentence. JP's memorandum affirmed that he continued to represent Appellant. It referred to many of the numerous documents Appellant wanted the convening authority to consider, including Appellant's own memorandum. However, JP did *not* refer to any allegations that he or Capt AH had provided ineffective assistance during Appellant's trial, nor to any potential conflict of interest regarding his continued representation of Appellant.

As part of the clemency submission, Appellant provided a lengthy memorandum (signed by his mother exercising power of attorney) dated 3 August 2016. Therein, Appellant specifically criticized JP's performance as his trial defense counsel in several respects and stated, "The sum of all the actions and the statements above seem to reflect ineffective and insufficient representations by my attorney."

Appellant's stepfather, HL, a lawyer who observed and briefly testified at Appellant's trial, also provided a lengthy memorandum for the convening authority dated 25 July 2016. Among other complaints, HL extensively criticized JP's performance at Appellant's trial and specifically accused JP of providing IAC. In addition, HL asserted JP "is specifically and well aware that I am totally displeased with his performance, and specifically invited me through my wife to state my full critique and present it to the Convening Authority."

Appellant's mother, JL, provided a memorandum for the convening authority dated 3 August 2016 that asserted, *inter alia*, JP provided ineffective assistance to Appellant. JL's memorandum criticized JP's performance in

several respects and repeatedly asserted JP "failed" her son. She further asserted that after the trial, JP "invited us to place in our letters for clemency any criticism."

On 8 August 2016, the SJA prepared an addendum to the SJAR that advised the convening authority, *inter alia*, as follows:

> [Appellant] alleges legal error in the form of ineffective assistance of counsel. Specifically, [Appellant] alleges his civilian defense counsel failed to introduce certain evidence and call certain witnesses at trial that would have been helpful to his case. [Appellant] also believes he did not receive a fair trial. I have carefully considered these allegations, and find them to be without merit.

The addendum did not address any potential conflict arising from JP's continued representation of Appellant during the clemency process in light of the allegations that JP provided ineffective assistance at trial. The SJA advised the convening authority his prior recommendation remained unchanged. The memoranda from JP, Appellant, HL, and JL described above were all among the numerous clemency documents listed as attachments to the addendum and provided to the convening authority.

On 10 August 2016, consistent with the SJA's advice, the convening authority approved the findings and the bad-conduct discharge, confinement for six years, and reduction to E-1; did not approve the adjudged forfeitures; and waived the mandatory forfeitures for six months for the benefit of Appellant's son.

Appellant did not raise the issue of post-trial IAC in his assignments of error. On 31 January 2018, this court issued an order to the Government to show good cause as to why a new post-trial process and action were not required due to JP's apparent conflict of interest. In response, the Government obtained additional declarations from JP and Capt AH.

JP stated, *inter alia*, he was aware Appellant and Appellant's family were "not happy" with the results of the court-martial. He stated that when he met with Appellant after the trial, he asked Appellant whether Appellant wanted him to continue to represent Appellant. Appellant said he wanted JP to stay on as his counsel for his post-trial clemency matters. In a separate post-trial meeting with Appellant's mother, JL, who had a power of attorney from Appellant, JP advised her that "if there was a problem" Appellant could terminate JP and use only Capt AH, or Appellant could obtain new counsel. JL told JP that JP would remain on the case. JP further asserted that he felt no conflict of interest, that "[n]ot agreeing with trial tactics does not mean that I

have a conflict of interest," and that he did "not resent clients being critical of their results."

Capt AH stated, *inter alia*, that before trial she advised Appellant of his rights to counsel, including his right to terminate herself or JP at any point. At no point did Appellant express a desire to terminate her or JP. Capt AH did not recall Appellant expressing dissatisfaction with their performance when she spoke with Appellant after trial. She was aware Appellant's parents were dissatisfied with JP's performance at trial and there had been a verbal confrontation between HL and JP during the trial. However, following this confrontation, JP confirmed with Appellant that Appellant wanted JP to continue to represent Appellant.

In response to these declarations, Appellant provided a declaration from JL, his mother. JL stated, *inter alia*, that JP "never spoke to us" about any conflict of interest that arose from the dissatisfaction of Appellant and his parents with JP's performance. In addition, JL asserted that she "did most of the work during clemency" because "[t]here was no Clemency strategy" and Appellant's "attorneys provided minimal useful and constructive help."

### 2. Law

We review questions of IAC de novo. *Gooch*, 69 M.J. at 362. A military accused has a fundamental right to effective assistance of counsel after his trial. *United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F. 2000) (citing *United States v. Palenius*, 2 M.J. 86 (C.M.A. 1977)). "This right to the effective assistance of counsel means the right to effective assistance of conflict-free counsel." *United States v. Carter*, 40 M.J. 102, 105 (C.A.A.F. 1994). "Where an accused attacks the competence of trial defense counsel, a conflict of interest may arise because it raises the question of whether trial defense counsel is 'mentally free of competing interests.'" *United States v. Cornett*, 47 M.J. 128, 133 (C.A.A.F. 1997) (quoting *United States v. Cornelious*, 41 M.J. 397, 398 (C.A.A.F. 1995)); s*ee also United States v. Cavan*, 48 M.J. 567, 569 (A.F. Ct. Crim. App. 1998) (SJA has obligation to address apparent conflict of interest for defense counsel representing accused post-trial in light of accused's complaint of ineffective assistance by that defense counsel).

### 3. Analysis

It is apparent JP had a conflict of interest in continuing to represent Appellant during the post-trial process, given the specific allegations by Appellant, HL, and JL of JP's ineffectiveness at trial. Appellant sought relief from the convening authority in part based on JP's allegedly deficient performance at trial. For JP's part, he had an obvious personal interest in defending his performance at trial. Both this court and the CAAF have recognized that continued representation by allegedly ineffective counsel in the shadow of such a

conflict raises the specter of IAC. *See Carter*, 40 M.J. at 105; *Cavan*, 48 M.J. at 569. As a result, Appellant now asserts a new post-trial process and convening authority action are required.

However, the Government argues there is no error here. It contends Appellant and his family made an informed decision to have JP continue to represent Appellant for clemency purposes, despite their dissatisfaction with JP's trial performance. The Government also relies on JP's affirmation that he was not offended by the complaints of Appellant and Appellant's family, and that his interests remained aligned with Appellant's. We are not persuaded.

The Government misconstrues the nature of the problem, which is that a conflicted counsel is a constitutionally inadequate counsel for purposes of post-trial representation of an accused. Under both the Sixth Amendment[6] and Article 27, UCMJ, 10 U.S.C. § 827, an accused is entitled to effective counsel—meaning conflict-free counsel—at the post-trial stage. *Carter*, 40 M.J. at 105 (citations omitted). Securing an accused's agreement to continue the complained-of counsel's representation *in spite of* the conflict does not resolve the conflict. Similarly, the counsel's assurance that he is not offended by the allegation of ineffectiveness does not resolve the conflict. In *Carter*, the CAAF explained that once a defense counsel becomes aware of an allegation of ineffectiveness,

> [d]efense counsel should advise the client as to the consequences of the termination of the relationship . . . and determine if the client wants to discharge the attorney *or is merely making the allegation out of frustration. . . .* If [the] appellant and his counsel are able to *resolve that issue*, then there could be continued representation by the same counsel.

*Id.* (citations omitted) (emphasis added). Contrary to the Government's position that it is sufficient to inform Appellant of his right to secure new counsel and to obtain Appellant's agreement to retain the allegedly ineffective counsel, *Carter* articulates two possible resolutions to the situation, both of which eliminate the conflict itself. First, the conflicted counsel may cease to represent the accused. Second, if the accused was merely speaking "out of frustration" and counsel and client are able to "resolve" the issue such that no allegation of IAC persists, there "could be continued representation." *Id.*

---

6 U.S. CONST. amend. VI.

Neither resolution was achieved here. Despite JP's evident awareness of the IAC allegations in the clemency submission, JP continued to represent Appellant for clemency purposes. Meanwhile, Appellant continued to assert, both to the convening authority and on appeal, that JP rendered ineffective assistance at trial. JP's memorandum to the convening authority was notably silent regarding Appellant's assertion of IAC, and, as described above, JP provided a declaration to this court that contradicted and rebutted Appellant's allegation of IAC on appeal. Thus the conflict persisted.

We further note the SJA erred in failing to ensure this issue was properly addressed. In *Cavan* we found, similar to the facts here, the "SJA was clearly on notice of [the] appellant's complaint against his defense counsel from [the] appellant's clemency letter." 48 M.J. at 569. We held the "SJA erred in not advising defense counsel of the apparent dissatisfaction of his client, and in proceeding with the post-trial process before this issue was properly resolved." *Id.* We then set aside the convening authority's action and directed a new clemency process, with conflict-free defense counsel to represent the appellant. *Id.* Similar corrective action is required here. *See United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998) (stating a colorable showing of possible prejudice arising from SJAR error requires either meaningful relief or new post-trial process and action).

## G. Delayed Appellate Review

Appellant's case was docketed with this court on 24 August 2016, more than 18 months before a decision was rendered. In *United States v. Moreno*, our superior court established a presumption of facially unreasonable delay when a service Court of Criminal Appeals does not take action within 18 months of docketing. 63 M.J. 129, 142 (C.A.A.F. 2006).

Because there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

As to the first factor—the length of the delay—the appellate review of Appellant's case has exceeded the *Moreno* standard of 18 months by less than

one month. Accordingly, this factor weighs in Appellant's favor, but only slightly.

As to the second factor—the reasons for the delay—Appellant filed his assignments of error on 21 August 2017 after securing six enlargements of time. On 31 August 2017, the Government requested an order to compel declarations from JP and Capt AH responsive to the IAC allegations, and an enlargement of time until 30 days after the Government received such declarations in order to file its answer. This court granted both. The Government received the initial declarations in October 2017 and filed its answer on 13 November 2017, at which point the case was joined before this court. Upon review of the record of trial, this court identified the issue of JP's conflict of interest involving his representation of Appellant during the post-trial process, which neither party had addressed or identified. Accordingly, on 31 January 2018 this court issued a show cause order to the Government, which led to the procurement of additional declarations from JP and Capt AH as described above. The Government filed its response to the show cause order on 28 February 2018, and Appellant replied to the Government's answer on 7 March 2018. In summary, the delays in this case were primarily attributable to Appellant's requests for enlargements of time, the Government's need to obtain declarations from trial defense counsel to respond to allegations of IAC at trial, and the need for this court to adjudicate a substantial issue of post-trial IAC, which Appellant failed to raise but for which he now seeks relief and which requires corrective action. In addition, a total of 11 distinct issues were before the court for decision. Under these circumstances, we find the reasons for delay weigh moderately against a finding of a due process violation.

As to the third factor—Appellant's assertion of his right to timely review—Appellant has lately asserted his right to timely review. Accordingly, this factor weighs slightly in Appellant's favor.

Turning to the fourth factor—prejudice—we note *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39. Where, as here, an appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id.* at 139 (citing *Cody v. Henderson*, 936 F.2d 715, 720 (2d Cir. 1991)). Similarly, where Appellant's substantive appeal against his conviction fails, his ability to present a defense at a rehearing is not impaired. *See id.* at 140–41. Furthermore, we do not discern any "particularized anxiety or concern that is distinguishable from the normal anxiety experienced" by appellants awaiting an appellate decision. *See id.* at 140. Accordingly, this factor weighs substantially against Appellant. *See Toohey*, 63 M.J. at 362.

Considering all the factors together we do not find a violation of Appellant's due process right to timely post-trial processing and appeal.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *Gay*, 74 M.J. at 744,[7] we conclude it is not.

### III. CONCLUSION

The record of trial is returned to The Judge Advocate General for remand to the convening authority for a new post-trial process and action consistent with this opinion. We further direct Appellant be provided new, conflict-free counsel to represent him in responding to the SJAR and submitting clemency matters to the convening authority pursuant to R.C.M. 1105. Article 66(e), UCMJ, 10 U.S.C. § 866(e). Thereafter, the record of trial will be returned to this court for completion of appellate review under Article 66, UCMJ, 10 U.S.C. § 866.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[7] These factors include: (1) how long the delay exceeded the standards set forth in Moreno; (2) what reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) whether there is evidence of harm to the appellant or institutionally caused by the delay; (4) whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and whether relief is consistent with the dual goals of justice and good order and discipline; (5) whether there is any evidence of institutional neglect concerning timely post-trial processing; and (6) given the passage of time, whether this court can provide meaningful relief in this particular situation.